On Application for a Rehearing

THOMAS, Judge.
The no-opinion affirmance of August 2, 2013, is withdrawn, and the following is substituted therefor.
Robert Dungan appeals from a judgment of the Baldwin Circuit Court establishing a boundary line between his property and that of Thomas W. Early and Tanya S. Early. We affirm the trial court’s judgment.
On February 8, 2012, the Earlys filed a complaint to establish a boundary line; the complaint listed Robert and his daughter, Christina Dungan, as defendants because the Earlys’ property adjoined property owned by the Dungans. On March 14, 2012, Robert answered the complaint. On May 10, 2012, Robert filed a motion for an injunction against the Earlys, and he also filed discovery requests.[1] On June 8, 2012, the Earlys filed a motion for a default judgment against Christina, who had failed to answer the complaint at that time. Christina filed an answer to the complaint on July 10, 2012, and, that same day, the trial court denied the motion for a default judgment. On July 11, 2012, the trial court conducted a trial at which it heard ore tenus evidence and at which documentary evidence was presented. The parties agree in their respective briefs that Robert was dismissed as a defendant before the trial date, and, thus, Christina was the only defendant at the start of trial. The record also supports this fact. However, the record also indicates that, during the trial, Christina transferred her interest in the Dungans’ property to Robert and that the parties stipulated to allow Robert to be substituted as a defendant in the action pursuant to Rule 25(c), Ala. R. Civ. P. Therefore, Robert was the only defendant to the action at the close of trial and, thus, is the only appellant in this appeal.
The testimony revealed the following facts. Christina testified that Robert had purchased the land upon which the disputed boundary lies for her benefit. She testified that Robert had had a survey and title search of the property prepared and that he and the Earlys had had disagreements regarding the boundary line separating their properties. She testified that Robert had removed “the pig fence” that the Earlys asserted in their complaint marked the boundary line between the parties’ properties. She also stated at the start of the trial that the pig fence had been located on her land as detailed in the survey and that a newly built privacy fence marked where the boundary line is located. She further testified that it was her understanding that the Earlys had not paid the property taxes on the disputed property— i.e., the property between the pig fence and the privacy fence — for ten consecutive years and, thus, that they could not rely upon that fact to support their claim that the pig fence was the true boundary line.
The survey was entered into evidence. Christina testified that parcel “C” on the survey showed the property Robert had purchased for her, which adjoined the Ear-lys’ property. She also testified that a line on the survey, located in the southeast corner of parcel C, depicted the pig fence that had been torn down. She testified that she had never viewed the property *1137 when the pig fence was still there. She further testified that the pig fence was there when Robert purchased the property but that it was not a true fence but merely a piece of a fence.
Thomas testified that he first noticed the pig fence in October 1999 when he was doing business with Howard Price, a person that had owned the Earlys’ property before they purchased it. Thomas testified that he and Tanya took possession of the property in the middle of 2001 and that he had paid the down payment with a deal to trade cars and had also paid a monthly payment of $300; he testified that he had entered into this purchase agreement with Brandy Price, a predecessor in interest in the property. Thomas testified that Aaron Early, his father, had moved onto the property in 2001 and had continually lived in his motor home on the property since that time. Thomas testified that in 2001, when he took possession of the property, Lorie Leiterman had held title to the adjoining property that Robert now owns. He said that Leiterman mentioned to him that the pig fence was the boundary line between the properties. Thomas offered into evidence pictures of the pig fence before its removal and testified that renters he had allowed on his property had planted gardenias and barbequed on the disputed property next to the pig fence. He also testified that a post with a “no trespassing” sign next to the pig fence had been placed there by one of his renters and that there was a metal stake along the pig fence that also marked the boundary he had used for over 10 years.
Thomas further testified that Robert had erected a privacy fence across a portion of the driveway that supplies the only passageway for the trailers his renters use; he said that there is a septic tank beneath another passageway to the property but that vehicles cannot be allowed to drive over the septic tank because they might damage it. He testified that Robert had also ceased allowing him to access a well on the disputed property that supplies water to two buildings located on his property. He testified that the well was there before he purchased his property, that it is on the disputed property that he is claiming to own, and that it has furnished water only to the buildings on his property since 2001. Thomas further testified that there is no other area of his property on which he could place a well due to the location of the septic tank.
Thomas testified that Robert had destroyed the pig fence, which, Thomas contended, marked the boundary line he had been told separated his property from the Dungans’ property. He testified that, following the removal of the pig fence, Robert had erected a privacy fence along the line Robert contended was the boundary fine. Thomas testified that, according to the placement of the privacy fence and the survey upon which Robert had relied in erecting the privacy fence, Robert was claiming three feet of a building that sits on what Thomas alleged had been his or his predecessors’ property since 1990. He further testified that his father had resided on his property for more than 10 years preceding the filing of the lawsuit and that his father, along with other renters, had occupied and used the property up to the area marked by the pig fence that had been destroyed. Thomas also testified that he had paid the taxes on the entire property he purports to own, which includes the disputed property, along with the taxes associated with the three buildings located on his property and/or the disputed property, each year since 2001 with the exception of several years in which he had accidently missed making the payments due to a misunderstanding with his sister. However, he testified that he had subsequently paid the taxes associated *1138 with the property for the entire 10-year period.
Aaron Early, Thomas’s father, testified that he had lived on the Earlys’ property since Thomas had purchased it. He further testified that he had a clear memory that he had lived on the property on September 11, 2001, because, he said, he remembers watching footage of the terrorist attacks that occurred on that date. He further testified that he had continuously lived on the property from about six months before the September 11, 2001, terrorist attacks until the date of the trial. Aaron testified that, during the entire time he had lived on the property, he had understood that the boundary line between the Earlys’ property and the Dungans’ property was marked by the pig fence, which Robert had destroyed after buying the adjoining property. He further testified that the driveway that he had continually used the entire time he had lived on the Earlys’ property had been blocked by Robert’s privacy fence.
On July 26, 2012, the trial court entered a judgment establishing the boundary as the place where the pig fence had been, as requested by the Earlys in their complaint, thereby implicitly denying the relief Robert had requested in his motion for injunc-tive relief. On August 24, 2012, Robert filed a postjudgment motion alleging that the evidence was insufficient to support the trial court’s judgment and that newly discovered evidence supported a judgment in his favor and noting that he had appeared pro se at trial. On November 20, 2012, the parties filed a joint agreement to waive the operation of Rule 59.1, Ala. R. Civ. P. On February 19, 2013, the trial court denied Robert’s postjudgment motion. Robert filed a timely notice of appeal with our supreme court on March 4, 2013. Our supreme court transferred the appeal to this court pursuant to § 12-2-7(6), Ala.Code 1975.
Because the trial judge received evidence ore tenus, our review is governed by the following principles:
“ ‘ “ ‘[W]hen a trial court hears ore tenus testimony, its findings on disputed facts are presumed correct and its judgment based on those findings will not be reversed unless the judgment is palpably erroneous or manifestly unjust.”” Water Works & Sanitary Sewer Bd. v. Parks, 977 So.2d 440, 443 (Ala.2007) (quoting Fadalla v. Fadalla, 929 So.2d 429, 433 (Ala.2005), quoting in turn Philpot v. State, 843 So.2d 122, 125 (Ala.2002)). ‘ “The presumption of correctness, however, is rebuttable and may be overcome where there is insufficient evidence presented to the trial court to sustain its judgment.” ’ Waltman v. Rowell, 913 So.2d 1083, 1086 (Ala.2005) (quoting Dennis v. Dobbs, 474 So.2d 77, 79 (Ala.1985)). ‘Additionally, the ore tenus rule does not extend to cloak with a presumption of correctness a trial judge’s conclusions of law or the incorrect application of law to the facts.’ Waltman v. Rowell, 913 So.2d at 1086.”
Retail Developers of Alabama, LLC v. East Gadsden Golf Club, Inc., 985 So.2d 924, 929 (Ala.2007).
Robert argues five issues on appeal: (1) whether the trial court violated his due-process rights by invoking Rule 615, Ala. R. Evid.; (2) whether the trial court’s judgment amounts to an unlawful taking; (3) whether the evidence supports the judgment; (4) whether appearing pro se violated his rights; and (5) whether the trial court erred in denying his post-judgment motion.
First, Robert argues that the trial court violated his due-process rights by invoking Rule 615 under the facts of this case. Specifically, he asserts that he was unable *1139 to hear the allegations against him, to cross-examine witnesses, or to present evidence due to the invocation of Rule 615.[2]
The record indicates that Rule 615 was invoked without any objection at the start of the trial when Christina was the only defendant in the action. Thus, Robert was asked to leave the courtroom because Christina indicated that she intended to call him as a witness during the trial. Accordingly, Robert was not allowed to remain in the courtroom until he was substituted as a party pursuant to Rule 25. The record further indicates that, once he was substituted as a defendant, he did not assert that he would be prejudiced because he had not been present to hear Thomas’s testimony or Christina’s testimony, nor did he request a new trial because he had not heard all the evidence; instead, he willingly participated in the remainder of the trial as the sole defendant. Additionally, the record indicates that he failed to argue in his postjudgment motion that he had been prejudiced by not hearing the entire testimony. Thus, Robert asserts this argument for the first time on appeal. “ ‘[I]t is a well-settled rule that an appellate court’s review is limited to only those issues that were raised before the trial court. Issues raised for the first time on appeal cannot be considered.’ ” Neal v. Neal, 856 So.2d 766, 778 (Ala.2002) (quoting Beavers v. County of Walker, 645 So.2d 1365, 1372 (Ala.1994)). Therefore, we will not consider Robert’s first argument.
Next, Robert contends that the trial court erred in establishing the boundary line as it did because, he says, the trial court’s judgment amounts to an unlawful taking under the facts of this case. He supports this argument by again stating that his due-process rights were violated by the fact that he was not in the courtroom for the initial witnesses’ testimony, which the trial court relied upon in its judgment. Robert asserts this unlawful-taking argument for the first time on appeal; therefore, we will not consider it. Neal, 856 So.2d at 778.
Next, Robert seems to assert an insufficiency-of-the-evidence argument. Specifically, he contends that the evidence did not support the conclusion that the Earlys had acquired the disputed property by adverse possession because, he says, the Earlys failed to show that the “possession [was] actual, hostile, open, notorious, exclusive, and continuous for the statutory period of 10 years.” We find Robert’s argument to be misguided under the facts of this case because he fails to grasp the law applicable to boundary-line disputes.
It is well settled that
“[boundary disputes are subject to a unique set of requirements that is a hybrid of the elements of adverse possession by prescription and statutory adverse possession.... In a boundary dispute, the coterminous landowners may alter the boundary line between their tracts of land by agreement plus possession for ten years, or by adverse possession for ten years.”
*1140 Kerlin v. Tensaw Land, & Timber Co., 390 So.2d 616, 618 (Ala.1980).
In Smith v. Brown, 282 Ala. 528, 534-35, 213 So.2d 374, 379-80 (1968), our supreme court noted the changes in the law regarding boundary-line disputes as follows:
“There are many decisions of this court dealing with the problem of adverse possession between coterminous land owners. The very early cases of this court strictly applied the ‘subjective intent’ rule which looks to the intention of the possessor as the controlling factor. This line of cases holds that unless the possessor has actually formed an intention to hold the strip, even though it is beyond the true line, the possessor’s position is not adverse. Brown v. Cockerell, 33 Ala. 38 [ (1858) ]; Alexander v. Wheeler, 69 Ala. 332 [(1881)]; Davis v. Caldwell, 107 Ala. 526, 18 So. 103 [ (1895) ]; Hess v. Rudder, 117 Ala. 525, 23 So. 136, 67 Am. St. Rep. 182 [ (1898) ]; Ashford v. McKee, 183 Ala. 620, 62 So. 879 [ (1913) ]. The rule is stated with great clarity in Hess v. Rudder, as follows:
“‘...Possession, to be adverse, must be held under a claim of right, and there can be no adverse possession without an intention to claim title. Hence it is essential to the proper determination of the character of the possession to consider the intention with which it was taken and held. If one occupies land up to a certain fence, because he believes that to be the line of his land, but not having any intention to claim up to the fence, if it should be beyond the line, the intent to claim title does not exist coincident with the possession, and the possession up to the fence is not, therefore, adverse.’
“This rule, however, was modified by later cases and in the case of Smith v. Cook, 220 Ala. 338, 124 So. 898 [ (1929) ], this court crystalized this modification and stated very precisely the modified rule which still prevails in this State.
“ ‘. .Appellants claim that the conclusion is controlled by principles of law settled by this court, which for convenience we will restate. If two coterminous proprietors agree on a boundary line, and each occupies to its location, the possession is presumed adverse, and after ten years has the effect of fixing such line as the true one. Turner v. DePriest, 205 Ala. 313, 87 So. 370 [ (1921) ]; Copeland v. Warren, 214 Ala. 150, 107 So. 94 [ (1926) ]; Gunn v. Parsons, 213 Ala. 217, 104 So. 390 [ (1925) ]; Mink v. Whitfield, 218 Ala. 334, 118 So. 559 [ (1928) ]; Smith v. Harbaugh, 216 Ala. 202, 112 So. 914 [ (1927) ]. If a coterminous landowner holds actual possession of the disputed strip under a claim of right openly and exclusively for a continuous period of ten years, believing that he is holding to the true line, he thereby acquires title up to that line, even though the belief as to the correct location originated in a mistake, and it is immaterial what he might or might not have claimed had he known he was mistaken. Smith v. Bachus, 201 Ala. 534, 78 So. 888 [ (1918) ]; Hoffman v. White, 90 Ala. 354, 7 So. 816 [(1890)]; Hopkins v. Duggar, 204 Ala. 626, 87 So. 103 [ (1920) ]; Shepherd v. Scott’s Chapel, 216 Ala. 193, 112 So. 905 [(1927)].
“ ‘There is, however, a limitation or an additional principle that, if the occupancy to a line is with no intention to claim to it if it should be beyond the true location of the boundary, such possession is not adverse. Hess v. Rudder, 117 Ala. 525, 23 So. 136, 67 Am. St. Rep. 182 [ (1898) ]; Smith v. Bachus, 195 Ala. 8, 70 So. 261 *1141 [ (1915) ]; Hodges v. Sanderson, 213 Ala. 563,105 So. 652 [ (1925) ].’ ”
In the present case, the testimony was clear that, when the Earlys took possession of their land in 2001, the Earlys were under the impression that the pig fence was the boundary line between the properties and, thus, the Earlys allowed renters and Aaron to occupy up to that line. The testimony also indicated that the renters had planted gardenias, had barbecued, had continuously used a driveway located on the disputed property for ingress and egress, and had placed “no trespassing” signs on the property surrounding the pig fence, establishing that the Earlys and their renters had occupied the property up to the pig fence. Additionally, Thomas testified that he had paid the taxes assessed on the property up to the pig fence and the buildings located on the property up to the pig fence for a 10-year period. Thus, the evidence supported a conclusion that the Earlys had had actual possession of the property on the east side of the pig fence under a claim of right openly and exclusively for a continuous period of 10 years based on their belief that the pig fence marked the true boundary line. Thus, although the belief that the pig fence marked the true boundary line was a mistaken belief, the Earlys acquired title up to that line because, under Smith, it is immaterial what the Earlys might or might not have claimed had they known they were mistaken. 282 Ala. at 535, 213 So.2d at 380. See Reynolds v. Rutland, 365 So.2d 656, 658 (Ala.1978) (concluding that the evidence was sufficient to support adverse possession in a boundary-line dispute when the a review of the record indicated that the “[a]ppellees did openly and notoriously hold the disputed strip in question intending to claim it as their own, although admittedly it was held under the mistaken belief that they were holding to the true line”). Therefore, we find that the record supports the trial court’s judgment establishing the boundary line under the rule pronounced in Smith.
Finally, Robert argues that he was prejudiced by acting pro se and that the trial court erred in denying his post-judgment motion. Robert filed his appeal pro se; however, he fails to support either argument with citation to relevant authority. Rule 28(a)(10), Ala. R.App. P., requires that arguments in an appellant’s brief contain “citations to ... cases, statutes, [and] other authorities.” “ ‘[A]n appellant’s citations to general propositions of law not specifically applicable to the issues presented by the appeal do not meet the requirements of Rule 28, Ala. R.App. P.’ ” Cincinnati Ins. Cos. v. Barber Insulation, Inc., 946 So.2d 441, 449 (Ala.2006) (quoting BankAmerica Hous. Servs, v. Lee, 833 So.2d 609, 621 (Ala.2002)). Furthermore,
“a pro se litigant must comply with legal procedures and court rules. Black v. Allen, 587 So.2d 349 (Ala.Civ.App.1991). Courts are no more forgiving to pro' se litigants than to those represented by counsel. Black, supra. Additionally, it has long been held that ‘[w]hen an appellant fails to cite any authority for an argument on a particular issue, this Court may affirm the judgment as to that issue, for it is neither this Court’s duty nor its function to perform an appellant’s legal research.’ City of Birmingham v. Business Realty Inv. Co., 722 So.2d 747, 752 (Ala.1998) (internal citations omitted). See also McLemore v. Fleming, 604 So.2d 353 (Ala.1992); Stover v. Alabama Farm Bureau Ins. Co., 467 So.2d 251 (Ala.1985); and Ex parte Riley, 464 So.2d 92 (Ala.1985).”
Schwartz v. Schwartz, 835 So.2d 1017,1018 (Ala.Civ.App.2002). Therefore, we decline to consider these arguments on appeal.

*1142
Conclusion

Because Robert has failed to establish any error warranting reversal of the trial court’s judgment, we affirm it.
APPLICATION GRANTED; NO-OPINION ORDER OF AFFIRMANCE OF AUGUST 2, 2013, WITHDRAWN; OPINION SUBSTITUTED; AFFIRMED.
THOMPSON, P.J., and PITTMAN, MOORE, and DONALDSON, JJ., concur.

. Robert’s motion for injunctive relief also listed numerous other parties as respondents in its style. However, the State Judicial Information System case-detail sheet indicates that no other parties were ever added to the action or served.

. Rule 615 states:
"At the request of a party the court may order witnesses excluded so that they cannot hear the testimony of other witnesses and it may make the order of its own motion. This rule does not authorize exclusion of (1) a party who is a natural person, (2) an officer or employee of a party which is not a natural person designated as its representative by its attorney, (3) a person whose presence is shown by a party to be essential to the presentation of the party’s cause, or (4) a victim of a criminal offense or the representative of a victim who is unable to attend, when the representative has been selected by the victim, the victim's guardian, or the victim's family.”